**SO ORDERED.**

**SIGNED this 20 day of June, 2014.**

*Stephani W. Humrickhouse*
Stephani W. Humrickhouse
United States Bankruptcy Judge

___

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NORTH CAROLINA
RALEIGH DIVISION

IN RE:

SHOTWELL LANDFILL, INC.,                    CASE NO. 13–02590–8–SWH
                                            CHAPTER 11
    DEBTOR.

ORDER REGARDING OBJECTION TO CLAIM AND
AMENDED CLAIM OF DAVID A. COOK

These matters came before the court upon the objection to the claim and amended claim of David A. Cook ("Cook") and Southfield Partners, LLC, ("Southfield") filed by the chapter 11 debtor in this case, Shotwell Landfill, Inc. ("debtor" or "Shotwell"). Hearings on the debtor's objections to the claims were held on March 25 and 26, 2014, in Raleigh, North Carolina.

The debtor filed a petition for relief under chapter 11 of the Bankruptcy Code on April 19, 2013. On August 19, 2013, Cook and Southfield filed proof of claim number 15 (the "original claim"), asserting an unsecured claim in the amount of $1,392,995.30 for monies they allege were owed to them by the debtor "pursuant to a series of prior transactions and agreements between the parties." The debtor filed an objection to the original claim on November 25, 2013, asserting that it was filed without basis and was in fact fraudulent. Cook and Southfield filed an amended proof of claim on January 31, 2014 (the "amended claim"), asserting an additional amount of $492,643

owed by the debtor to Cook in connection with unpaid employment compensation, for a total of $1,885.638.[1] The debtor filed an objection to the amended claim on March 24, 2014, stating that its records indicated no amount owed on the Cook claim.

## BACKGROUND

The events and occurrences relevant to the debtor's objections to Cook's claim require a brief history of the debtor, its business, and Cook's involvement in the debtor's business. The debtor owns and operates a landfill located in Wake County, North Carolina, and is managed through its principal, David King ("King"). King is also the owner of several other entities which assist the debtor in the operation of its landfill. These other entities provide grading services, trash and garbage collection, and serve as "transfer stations" where garbage is held until it is ultimately moved to the debtor's landfill. The debtor is, for lack of a better term, the "head entity" in the landfill operation overseen by King; the cash from the related entities, along with the trash, all flow to the debtor.

In 2008, one of the related entities owned by King, Dynasty Holdings, LLC ("Dynasty"), acquired certain land in Wake County to serve as a transfer station in furtherance of the debtor's landfill operation (the "Dynasty Transfer Station"). Although Dynasty was to own the land, the transfer station was to be operated by another entity owned by King, Shotwell Transfer Station, Inc. When it began the process to acquire the land for the transfer station, the debtor asserts that Dynasty believed the land was free and clear of all liens and encumbrances. However, it was discovered that Cook and Southfield, in fact, held deeds of trust on the land to be purchased by Dynasty. These

---

[1] Southfield Partners, LLC, is an entity owned by David Cook and his wife. Although it will be necessary at times to refer to both Cook and Southfield in their individual capacity, the collective claim which they assert will be referred to as the "Cook claim" or "Cook's claim."

deeds of trust secured an obligation owed to Cook and Southfield by the seller. To facilitate the closing, in September of 2008, Cook and Southfield entered into an agreement with King and Dynasty whereby Cook and Southfield agreed to subordinate their deeds of trust to those of BB&T in connection with the loan BB&T was making to Dynasty for its purchase of the land. In return, Dynasty agreed to assume the seller's obligation owed to Cook and Southfield and was to pay them the amount of $844,273.42 (of which $755,000 represented principal and $89,273.42 represented accrued interest) plus interest of 12% on the principal balance (the "Repayment Agreement").

Additionally, in conjunction with the Dynasty transaction and as a result of the relationship developed between King and Cook during the transaction, Cook became employed by the debtor in 2008 and served as its chief financial officer until 2012. Cook claims that his annual salary while working for the debtor was $120,000 and that, pursuant to an employment contract, he was to accrue certain bonuses. According to Cook, the bonuses were to accrue at a rate of $10,000 each month and were to be distributed upon the sale of certain facilities the debtor was to develop.

In 2012, a sale of the Dynasty Transfer Station was contemplated to a third party. In connection with the sale of the Dynasty Transfer Station, Cook and Southfield entered into an agreement with King in June of 2012 (the "Memorandum Agreement"). Pursuant to the Memorandum Agreement, Cook and Southfield agreed to release Dynasty of its obligation under the Repayment Agreement and further agreed to release their deeds of trust on the land owned by Dynasty. In return, Cook and Southfield obtained an equity interest in the debtor, amounting to 6.75% of the debtor's issued and outstanding stock. In addition, so long as Cook and Southfield owned the shares, the debtor was to make minimum quarterly annual distributions to the

shareholders equal to 40% of the debtor's taxable income earned during that quarter.[2]  Finally, as memorialized in the Memorandum Agreement, the "parties" agreed to use their best efforts to consummate an investment in the debtor by TT&E Iron and Metal, Inc.  In the event of such investment, Cook and Southfield were to receive the first $1,350,000 of the investment proceeds in exchange for their shares.  In the event the transaction was not consummated, King was to pursue an alternative transaction to obtain an investment in, or sale of the debtor, and Cook and Southfield were to receive the same priority in the proceeds of such a transaction.

Although the sale of the Dynasty Transfer Station to the third party did occur, neither the investment by TT&E Iron and Metal ("TT &E") in the debtor nor any other investment in or sale of the debtor has yet to occur.  Accordingly, Cook and Southfield have not received the $1,350,000 they were anticipating in exchange for their 6.75% interest in the debtor.  At or around the time of the proposed investment by TT&E in the debtor, Cook became employed by TT&E as its chief financial officer.

In the original proof of claim filed by Cook and Southfield on August 19, 2013, Cook asserted an unsecured claim against the debtor in the amount of $1,392,995.30.  Of this amount, $42,995.30 corresponds to reimbursement Cook claims he was owed but not paid by the debtor to offset taxes he and Southfield had to pay on their Phantom Income.  The remaining $1,350,000 of

---

[2] It was revealed at the hearings on the debtor's objections to the Cook claim that, because of the debtor's "S" Corporation status, these distribution were meant to ensure that Cook was reimbursed for any taxes he or Southfield would be required to pay based on income that would be imputed to them as shareholders of the debtor, regardless of whether Cook and Southfield actually received any distributions from the debtor.  Cook referred to this imputed income as "Phantom Income."

4

the original claim represents funds that Cook and Southfield expected to receive upon an investment in, or the sale of the debtor, in accordance with the terms of the Memorandum Agreement.

On January 31, 2014, Cook and Southfield filed their amended claim, alleging an additional amount of $492,643 "due to Cook in connection with employee compensation owed by the Debtor." Of the $492,643 in alleged unpaid compensation contained within the amended claim, Cook asserts that $240,000 related to unpaid bonuses.

In summary, Cook and Southfield collectively assert three separate and distinct obligations owed by the debtor. In the original claim, Cook asserts a claim related to reimbursement for taxes paid on the Phantom Income in the amount of $42,995.30 and a claim related to the $1,350,000 he and Southfield expected to receive from sale of or investment in the debtor. Both of these obligations are evidenced by the Memorandum Agreement that Cook and Southfield entered into with King in June of 2012. In Cook's amended claim, Cook additionally alleges a debt related to compensation he asserts the debtor failed to pay him during his employment with the debtor from 2008 thru 2012 in the amount of $492,643. The debtor has raised different objections to each of the three claim components.

As to the $1,350,000 component, the debtor alleges that it was not a party to the Memorandum Agreement; the agreement was not signed on behalf of the debtor and the debtor is not listed as a party to the agreement. Notwithstanding that King may have obligations under the Memorandum Agreement, the debtor asserts that *it* does not. In addition, to the extent that the debtor may be obligated under certain *portions* of the Memorandum Agreement, the debtor claims that the specific language giving rise to the $1,350,000 priority in the proceeds of a sale or investment in the debtor does not contain any affirmative obligations on the debtor to either sell or

5

seek an investment or pay any money to Cook and Southfield. The debtor maintains that Cook and Southfield were to be reimbursed for their equity interest upon the sale of, or investment in, the debtor, and it was specifically King who was to use his "best efforts" to pursue such a transaction, not the debtor. Conversely, Cook asserts that the *debtor* is obligated under the Memorandum Agreement to pay him and Southfield $1,350,000.

With regard to the claim related to Phantom Income, the debtor again asserts that it is not a party to the Memorandum Agreement, from which this claim arose. Additionally, the debtor argues that Cook has not satisfied his burden to produce sufficient evidence of the amount owed to him. In return, Cook alleges that its properly filed original claim is *prima facie* evidence of the amount and validity of the claim, and it is the debtor who has not presented sufficient evidence to rebut this presumption.

Finally, the debtor argues that the $492,643 compensation component of Cook's claim, which was first included in the amended claim, is untimely and should not be able to relate back to the timely filed original claim because it is substantially different from the claims set out in the original claim. If the amended claim is not able to relate back to the original claim, the debtor argues that the amended claim should be disallowed in its entirety. Alternatively, the debtor attacks the substance of the claim by disputing the very existence of the compensation claim and asserting that it does not owe Cook unpaid compensation in the amount he alleges. Finally, the debtor also argues that a portion of Cook's compensation claim is barred by the applicable statute of limitations found in either North Carolina General Statute §§ 1-53 and 95-25.22(f) or in § 1-52(1), applicable to breach of contract actions. In response, Cook argues it is within the court's discretion to allow

the relation back of the amended claim, that such relation back is appropriate under the circumstances, and that the claim is not barred by any applicable statute of limitations.

## DISCUSSION

### I.    The Compensation Claim

Initially, we begin by noting the claims allowance process and address whether Cook's amended claim should be allowed, at all, based on the debtor's contention that the amended claim was not timely filed. Pursuant to § 502(a) of the Bankruptcy Code, a properly filed proof of claim is deemed allowed unless a party in interest objects. 11 U.S.C. § 502(a). Upon the objection of a party in interest, the court, after notice and hearing, shall determine the amount of such claim and shall allow the claim in such amount, except to the extent that the claim falls into certain enumerated categories. 11 U.S.C. 502(b). One of those enumerated categories that provides for the disallowance of claims is if "proof of such claim is not timely filed." 11 U.S.C. § 502(b)(9). Pursuant to Bankruptcy Rule 3003, in chapter 11 cases, the court "shall fix and for cause shown may extend the time within which proofs of claim may be filed." Fed. R. Bankr. P 3003(c)(3).

Here, the court established August 19, 2013, as the deadline for the filing of proofs of claims, as to non-governmental entities. The original claim was filed on August 19, 2013, the last day to file a timely claim; the amended claim was filed on January 31, 2014, more than five months after the claims bar date. Based on the untimeliness of the amended claim, the court must determine whether the amended claim should be allowed to relate back to the filing of the original claim or whether the amended claim may be allowed despite its untimeliness.

Neither the Bankruptcy Code nor the Rules specifically address allowance of amended proofs of claim. <u>Clamp-All Corp. v. Foresta (In re Clamp-All Corp.)</u>, 235 B.R. 137, 140 (1st Cir.

BAP 1999). Bankruptcy Rule 7015, which incorporates Rule 15 of the Federal Rules of Civil Procedure in *adversary proceedings*, allows relation back when "the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out - or attempted to be set out - in the original pleading." Fed. R. Bankr. P. 7015(c)(1)(B). Similarly, courts typically allow relation back of an amendment to a timely filed proof of claim "where the purpose is to cure a defect in the claim as originally filed, to describe the claim with greater particularity or to plead a new theory of recovery on the facts set forth in the original claim." In re International Horizons, Inc., 751 F.2d 1213, 1216 (11th Cir. 1985). See also In re Sambo's Restaurants, Inc., 754 F.2d 811, 816-817 (9th Cir.1985); In re Commonwealth Corporation, 617 F.2d 415, 420 (5th Cir.1980); Ronald J. & Dana Cohen Family Ltd. P'ship v. City of Capitals, Inc., 829 F.2d 36, 1987 WL 44680, at *1 (4th Cir.1987) (per curiam) (unpublished). Furthermore, when faced with post bar date amendments to proofs of claim, the court must subject the amended claim "to careful scrutiny to prevent an attempt to file a new claim under the guise of an amendment." In re Mitchell, 116 B.R. 63, 64 (Bankr. W.D. Va. 1990) (citing In re Newcomb, 60 B.R. 520, 522 (Bankr. W.D. Va. 1986)). See also In re Workman, 373 B.R. 460, 464 (Bankr. D.S.C. 2007). Finally, whether to allow an amendment to a timely filed proof of claim is an equitable determination that lies within the sound discretion of the court. See In re Hemingway Transport, Inc., 954 F.2d 1, 10 (1st Cir. 1992).

    Numerous courts have employed a two-pronged test to determine whether to allow amendments to a timely filed proof of claim. Applied Sci. Int'l, LLC v. Torres (In re Steel Network, Inc.), 2010 WL 3000214 at *3 (Bankr. M.D.N.C. July 30, 2010) (compiling cases).

> First, they examine whether there was a timely assertion of a similar claim or demand evidencing an intention to hold the estate liable. An amendment will meet this threshold if it 1) corrects a defect of form in the original claim; 2) describes the original claim with greater

> particularity; or 3) pleads a new theory of recovery on the facts set forth in the original claim. Second, if an amendment does, in fact, "relate back" to the timely filed claim, courts will examine each fact within the case and determine whether it would be equitable to allow the amendment.

Midland Cogeneration Venture L.P. v. Enron Corp. (In re Enron Corp.), 419 F.3d 115, 133 (2d Cir. 2005) (citations omitted) (internal quotation marks omitted).[3]

The compensation component does not appear to be properly set out or otherwise preserved in the original proof of claim. Three documents are attached to the original proof of claim: an "Explanation of Claim," an "Addendum" and Cook's 2012 draft schedule K-1. Pursuant to the Explanation of Claim, Cook and Southfield describe the basis of their claim as follows: "David A. Cook and Southfield Partners, (collectively 'Creditor') have an unsecured claim against Shotwell Landfill, Inc. (The 'Debtor') pursuant to a series of prior transactions and agreements between the parties. Such claim is in the amount of $1,392,995.30 (see attached Addendum for supporting calculations)." The attached addendum appears to show calculations which support the claim for reimbursement associated with the Phantom Income and mentions the $1,350,000 component, but

---

[3] As recognized in In re Steel Network, other courts which utilized a similar two-pronged test include:

> In re Tri–State Ethanol Co., LLC, 2009 WL 1079776 (Bankr.D.S.D.2009); In re Hawaiian Airlines, Inc., 386 B.R. 251 (D. Hawaii 2008); In re Integrated Resources, Inc., 157 B.R. 66, 69–70 (S.D.N.Y.1993); In re Asia Global Crossing, Ltd., 324 B.R. 503 (Bankr.S.D.N.Y.2005); In re Brown, 159 B.R. 710 (Bankr.D.N.J.1993); In re Coover, 2006 WL 4491439 (Bankr.D.Kan.2006); In re Parsons, 135 B.R. 283 (Bankr.S.D.Ohio 1991); In re Wilson, 136 B.R. 719 (Bankr.S.D.Ohio 1991); In re McLean Indus., Inc., 121 B.R. 704 (Bankr.S.D.N.Y.1990); In re Leonard, 112 B.R. 67 (Bankr.D.Conn.1990).

2010 WL 3000214 at *3 (Bankr. M.D.N.C. July 30, 2010).

the compensation component is not referenced at all.  A reproduction of the addendum is set out below:

### Addendem to Proof of Claim
### Debtor: Shotwell Landfill, Inc. 13-02590-8-SWH (Case Filed 4/19/13)
### Creditor: David A. Cook and Southfield Partners, LLC

| | | | |
|---|---|---|---|
| Income allocated to Creditor per draft 2012 K-1 (copy attached) for the period 6/14/2012 to 12/31/12 (201 days) | $69,694.00 | | |
| Times amount required to be distributed to Creditor | 40% | | |
| 2012 amount due to Creditor | | $27,877.60 | |
| | | | |
| Income allocated to Creditor per draft 2012 K-1 for the period 6/14/2012 to 12/31/12 (201 days) | $69,694.00 | | |
| Divided by days of ownership in 2012 | 201 | | |
| Per diem estimate for 2013 | $346.74 | | |
| Times pre petition days in 2013 (1/1/13 to 4/19/13) | 109 | | |
| Estimated 2013 pre-petition income allocated to Creditor | $37,794.26 | | |
| Times amount required to be distributed to Creditor | 40% | | |
| Estimated 2013 pre-petition amount due to Creditor | | $15,117.70 | |
| **Total estimated pre-petition amount due Creditor for 2012 & 2013 allocations** | | | $42,995.30 |
| **Additional claim of Creditor per Agreements with Debtor** | | | $1,350,000.00 |
| **Total amount of claims as of Petition Date** | | | $1,392,995.30 |

These three documents, the Explanation of Claim, the Addendum and the 2012 draft K-1 are the only documents attached to the original claim that describe the basis for the claim. Although the original claim and its attachments provide a minimum of information regarding the Phantom Income and stock reimbursement components (i.e., the Memorandum Agreement was not attached), those components of the claim are at least identified. However, nowhere in the original proof of claim or its attachments is there any indication that Cook was owed unpaid compensation from the debtor or that Cook would later seek to amend to set forth such a claim. In fact, the addendum to the original proof of claim specifically stated that the "total amount of claim as of Petition Date" amounted to $1,392,995.30. The only indication that Cook and Southfield might amend any assertions made in the original proof of claim appears in the second paragraph of the "Explanation of Claim," which states "[i]n prior communications with the Debtor, the Debtor has asserted, at times, that the claim of Creditor is limited to an equity interest. Creditor denies such assertion, but reserves the right, in the alternative, to assert such claim as an equity interest." Accordingly, the amended claim is not an attempt to cure a defect that was present in the original claim or to describe the original claim with greater particularity.

Additionally, and perhaps more importantly, the compensation component is unrelated to any of the claims asserted in the original proof of claim. The original claim is comprised of the Phantom Income component and the $1,350,000 stock component, both of which are evidenced by the Memorandum Agreement. The Memorandum Agreement does not contain any provision regarding compensation to Cook. The amended claim does not plead a new theory or arise from the same set of facts asserted in the original proof of claim.

However, Cook asserts that relation back to the amended claim is appropriate. To support his argument, he notes that within the original claim, he and Southfield assert that they held unsecured claims against the debtor "pursuant to a series of prior transactions and agreements between the parties." Cook argues that the compensation claim arises from a prior "agreement" between him and the debtor, and that the amended claim is merely describing which agreements he was referring to in the original claim with greater particularity. Cook introduced a one-page typed document with handwritten notations and line-outs, which he claims is the employment contract between him and the debtor. The debtor steadfastly denies even ever seeing the document.

A determination of the validity of the "employment contract" introduced by Cook is not necessary. The court finds that the causal reference to "prior transactions and agreements" in the original proof of claim is not sufficient to give notice of the compensation claim. None of the factors necessary for relation back of an amended proof of claim are present here. The amended claim does not cure a defect in the original claim or describe the original claim with more particularity. Instead, Cook asserts an entirely new claim arising from alleged unpaid wages and compensation during Cook's employment with the debtor from 2008 through 2012. This compensation component is wholly unrelated to and does not arise from the same set of facts pled in the original proof of claim. Accordingly, relation back of the amended claim to the time of the original proof of claim shall not be allowed.

Notwithstanding the unavailability of relation back of the amended claim, the court must consider whether to allow the late filed claim. Bankruptcy Rule 9006 provides a general rule for the computation, enlargement and reduction of time periods prescribed by the bankruptcy rules or by orders of the court. See Pioneer Inv. Servs. v. Brunswick Assocs. Ltd. P'ship, 507 U.S. 380, 383

(1993). Pursuant to Rule 9006(b)(1), "the court for cause shown may at any time in its discretion . . . on motion made after the expiration of the specified time period permit the act to be done where the failure to act was the result of excusable neglect." Fed. R. Bankr. P. 9006(b)(1).

The Supreme Court in Pioneer Inv. Servs. v. Brunswick Assocs. Ltd. P'shipHere, 507 U.S. 380 (1993) addressed how to apply the "excusable neglect" standard of Rule 9006(b)(1) when faced with an untimely proof of claim filed twenty days after the claims bar date, due to an attorney's inadvertence. There, the Court adopted a flexible understanding of "excusable neglect" and interpreted the term "neglect" to mean "late filings caused by inadvertence, mistake, or carelessness, as well as by intervening circumstances beyond the party's control." Pioneer, 507 U.S. at 388–89. See also Thompson v. E.I. DuPont de Nemours & Co., 76 F.3d 530, 533 (4th Cir. 1996). The Court held that the determination of whether the neglect to file a timely proof of claim is excusable is "at bottom an equitable one, taking account of all relevant circumstances surrounding the party's omission." Pioneer at 395. Some of the equitable considerations identified by the court included "the danger of prejudice to the debtor, the length of the delay and its potential impact on judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith." Id. Nonetheless, whether to grant the relief afforded by Rule 9006 is within the court's discretion and it has been suggested that the court should not reach the equities of the case until the court has first determined that the late filing was the result of excusable neglect. Pioneer, 507 U.S. at 400 (O'Conner. J., dissenting) ("Rule 9006(b) does not simply command courts to permit late filing whenever it would be "equitable" in light of all the circumstances. Rather, it establishes that the courts may exercise their discretion in accord with the equities only if the failure to meet the deadline resulted from excusable neglect in the first place.").

During the hearing on the debtor's objection to the Cook claims, Cook admitted that at the time he and his counsel filed the original proof of claim, he was aware that he held a claim against the debtor for unpaid compensation *and* that he knew the amount of the claim. Even though Cook knew the amount that was owed to him, he conceded that he merely decided not to include it in his original proof of claim. Cook's explanation for not including the compensation component in his original claim was that he did not know how to reflect or include it in a proof of claim, at least, not until January 31, 2014, more than five months after the claims bar date. Cook's calculated and conscious decision to not include the compensation component in the original proof claim, when he was aware of such claim and the amount he was owed is not a mere inadvertence, mistake or carelessness and does not constitute the excusable neglect contemplated by the Bankruptcy Rules. Because the compensation component of the amended proof of claim cannot relate back to the original filing and because there is no basis to allow the late filing, the compensation claim shall be disallowed.

## II.     Reimbursement for Taxes paid on the Phantom Income

In the original proof of claim, Cook alleges the debtor owes him and Southfield the sum of $42,995.30 to offset the taxes they paid on the Phantom Income. The debtor argues that Cook has not satisfied his burden of proof by producing sufficient evidence to support this component of his claim. In response, Cook argues that, instead, it is the debtor who has not satisfied its burden in overcoming Cook's properly filed original proof of claim, which he asserts is *prima facie* evidence of the amount and validity of the claim.

Bankruptcy Rule 3001 describes the required form and contents of a proof of claim. Rule 3001(a) requires that a proof of claim be in writing, setting forth a creditor's claim, and conforms substantially to Official Form 10. Fed. R. Bankr. P. 3001(a). In re Andrews, 394 B.R. 384, 389 (Bankr. E.D.N.C. 2008). Additionally, Rule 3001(c) provides that when a claim is based on a writing, "a copy of the writing shall be filed with the proof of claim." Fed. R. Bankr. P. 3001(c)(1). Furthermore, "[a] proof of claim executed and filed in accordance with these rules shall constitute prima facie evidence of the validity and amount of the claim. Fed. R. Bankr. P. 3001(f).

Once a claim is entitled to a presumption of prima facie validity,

> [t]he burden then shifts to the debtor to object to the claim. 11 U.S.C. § 502(b). The debtor must introduce evidence to rebut the claim's presumptive validity. Fed. R. Bankr. P. 9017; Fed. R. Evid. 301. If the debtor carries its burden, the creditor has the ultimate burden of proving the amount and validity of the claim by a preponderance of the evidence.

Stancill v. Harford Sands Inc.(In re Harford Sands Inc.), 372 F.3d 637 (4th Cir. 2004) (citations omitted). In specifically addressing what is required of a debtor in order to overcome the presumption of *prima facie* validity, the debtor must produce evidence of equal probative value in rebuttal. In re Falwell, 434 B.R. 779, 784 (Bankr. W.D. Va. 2009) (citing In re Holm, 931 F.2d 620, 623 (9th Cir. 1991); In re Fullmer, 962 F.2d 1463, 1466 (10th Cir. 1992); In re Allegheny International, Inc., 954 F.2d 167, 173-74 (3rd Cir. 1992)).

As detailed in Section I, *supra*, in the original proof of claim, Cook attached an Explanation of Claim, an Addendum and a draft 2012 schedule K-1 to evidence the amount owed to him by the debtor. A schedule K-1 is a form used by "S" Corporations to report each shareholder's share of income or losses, along with dividends, for any particular year. Because Cook has alleged that the

15

debtor owed him 40% of the income that would be attributable to him and Southfield as owners of the debtor's stock, the income listed on the schedule K-1 could be used to calculate the 40% owed to Cook.

Specifically, the debtor disputes the ability of the Cook to use a *draft* 2012 schedule K-1 in order to determine the amount owed to him pursuant to the "Phantom Income" component of the Memorandum Agreement. The debtor argues that since Cook did not produce any evidence of the *actual* income that was attributed to him and Southfield in 2012 as equity owners in the debtor but instead provided a *draft* K-1 prepared by the debtor's CPA, Cook did not present a *prima facie* case, i.e. Cook's original proof of claim did not satisfy the requirements of Bankruptcy Rule 3001. Additionally, the debtor objects to Cook's use of the draft *2012* K-1 to determine the income, and thus the 40% he was owed for periods of *2013* prior to the debtor's bankruptcy petition. Cook counters that he presented enough evidence, by way of attachment to his proof of claim, to satisfy the requirements of Bankruptcy Rule 3001 and thus, his claim should receive a presumption of *prima facie* validity.

Cook's original proof of claim was prepared using Official Form 10 and otherwise complies with the requirements of Rule 3001. Additionally, although Cook's attachments to the original proof of claim concerning the Phantom Income are certainly not the best evidence of the claim, those attachments are sufficient to satisfy Rule 3001 and afford him a presumption of *prima facie* validity. Cook testified that he received the draft schedule K-1 from the debtor's CPA and the debtor does not dispute this fact. In order for the debtor to meet its burden after being presented with *prima facie* evidence of a claim, the debtor must produce *some* evidence to negate either the amount or validity of the claim. See In re Cluff, 313 B.R. 323, 339 (Bankr. D. Utah 2004) (holding that debtors had

16

not met their burden in rebuttal when they had merely asserted that a proof of claim was not properly documented and failed to produce any evidence in rebuttal). See also In re Irons, 343 B.R. 32, 41 (Bankr. N.D.N.Y. 2006) (holding debtors had not met their burden even as to proofs of claim which were *not* entitled to a presumption of *prima facie* validity when the debtors offered no evidence to contradict the amount of the claims and evidence existed to support the creditor's claims). The debtor offered little to no evidence to dispute either the amount or validity of the Phantom Income component of Cook's claim. Although the Memorandum Agreement was not signed by the debtor, King admitted that he intended for the debtor to pay the obligation associated with the Phantom Income and the Memorandum Agreement affirmatively places this obligation on the debtor. Furthermore, if the debtor wished to dispute the *amount* that was owed Cook pursuant to this obligation, it was incumbent on the debtor to produce evidence to refute this amount, which the debtor failed to do. Accordingly, the portion of Cook's claim which relates to the Phantom Income is allowed in the amount of $42,995.30.

### III.    The $1,350,000 Claim

The debtor asserts several arguments regarding the $1,350,000 component of Cook's claim, including: (1) the debtor did not sign the Memorandum Agreement and was not a party to the Agreement; (2) the portion of the Memorandum Agreement that contains the $1,350,000 component places no affirmative obligations on the debtor, and; (3) the $1,350,000 component relates to Cook and Southfield's equity in the debtor and the obligation to purchase or payout the equity has not yet arisen as there has not been a sale of, or investment in, the debtor. In response, Cook maintains that

the Memorandum Agreement evidences a $1,350,000 claim owed to him and Southfield by the debtor, as opposed to an equity interest.

There can be no doubt that Cook and Southfield own an equity interest in the debtor. The Memorandum Agreement provided for Cook and Southfield's acquisition of debtor stock in exchange for satisfaction of secured debt. Cook testified that he and Southfield owned stock in the debtor and a copy of the stock certificate was introduced as an exhibit, showing that Cook and Southfield owned 337.5 shares of stock in the debtor, "in its capacity as custodians of the retirement plans."[4] Furthermore, Cook is listed as an equity security holder in the debtor's schedule and statement of financial affairs. Although the debtor only listed Cook as holding an "uncertain" interest, in contrast to the 100% interest listed for King, Cook is nonetheless the only other party aside from King listed as an equity security holder.

The Memorandum Agreement expressly provides:

> King shall cause Shotwell to issue shares representing 6.75% of the issued and outstanding stock of Shotwell to Cook and Southfield in its capacity as custodian of the retirement plans (the "Shares"). The Shares shall be fully assessed, validly issued, fully paid and nonassessable and for so long as Cook and Southfield shall own the Shares, the ownership interest they represent in Shotwell shall not be diluted in any way, shape or form.

The very next paragraph of the Memorandum Agreement further states that:

> The parties agree to use their best efforts to consummate the proposed investment in Shotwell by TT&E Iron and Metal, Inc. or its principal owners. In such event, Cook and Southfield shall receive

---

[4] Neither the debtor nor Cook mentioned the significance of Cook and Southfield's ownership of the stock in their capacity as custodians of the retirement plans. In fact, neither party disputed that Cook and Southfield's owned stock in the debtor. To the extent that Cook or Southfield's ownership of the debtor's stock may be conditioned upon certain rights, duties and obligations as custodians of certain retirement plans, it is not necessary for this order to define them.

18

> the first $1,350,000 of the investment proceeds in exchange for their Shares. In the event that transaction is not consummated, King shall pursue an alternative transaction to obtain an investment in Shotwell or a sale of Shotwell under acceptable terms. In such event, Cook and Southfield shall receive the first $1,350,000 of the purchase price for their Shares.

Cook maintains that he and Southfield have a claim against the debtor in the amount of $1,350,000 pursuant to the Memorandum Agreement. The court does not agree. The $1,350,000 component of the Memorandum Agreement represented monies Cook and Southfield were to receive in exchange for their shares in the debtor, upon the investment in or sale of the debtor. The above-quoted provision is a shareholder agreement setting out the priority of payment of equity. See Snyder v. Freeman, 300 N.C. 204, 266 S.E.2d 593 (1980) (holding that when all of the shareholders of a closely held corporation agreed, in writing, to sell 6,000 shares of stock to a third party and use the proceeds thereof to pay a debt owed to one of the corporation's employees, the corporation could be bound by agreement even though the corporation was not a signatory to the document). There being no investment in or sale of the debtor occurring pre-petition, or at any time thereafter, this obligation to purchase equity is contingent. Furthermore, to the extent an "alternative transaction" was to be pursued, the Memorandum Agreement places the obligation on King, not the debtor. The $1,350,000 component instead relates to Cook and Southfield's interest as equity security holders in the debtor. Accordingly, to the extent Cook asserts a *claim* against the debtor in the amount of $1,350,000, such claim is denied.

However, the equity interest of Cook and Southfield will be recognized. Pursuant to Bankruptcy Rule 3003(c)(2), "[a]ny creditor or equity security holder whose claim or interest is not scheduled or scheduled as disputed, contingent, or unliquidated shall file a proof of claim or interest within the time prescribed by subdivision (c)(3) of this rule." Fed. R. Bankr. P. 3003(c)(2). Cook's

status as an equity security holder was preserved by either the debtor's designation of such in his schedules, Fed. R. Bankr. P. 3003(b)(2), or Cook's timely filed original proof of claim, which included the $1,350,000 component. Accordingly, Cook and Southfield collectively shall be allowed an equity security interest in the debtor in the amount of 337.5 shares, representing 6.75% of the outstanding shares.

In summary: (1) the portion of Cook's claim related to the compensation component and first set out in the amended claim is disallowed; (2) the portion of the claim related to the reimbursement for taxes paid on the Phantom Income is allowed in the amount of $42,995.30, and; (3) Cook's claim related to the $1,350,000 component is disallowed, but shall be allowed as a 6.75% equity security interest in the debtor.

**SO ORDERED.**

**END OF DOCUMENT**