**SO ORDERED.**

**SIGNED this 4 day of September, 2014.**

$\phantom{xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx}$_____
　　　　　　　　　　　　　　　　**Stephani W. Humrickhouse**
　　　　　　　　　　　　　　　　**United States Bankruptcy Judge**

_____

### UNITED STATES BANKRUPTCY COURT
### EASTERN DISTRICT OF NORTH CAROLINA
### RALEIGH DIVISION

IN RE:

| | |
|---|---|
| SHOTWELL LANDFILL, INC., | CASE NO. 13–02590–8–SWH |
| CAPITAL WASTE TRANSFER, LLC, | CASE NO. 13–07568–8–SWH |
| CAPITAL RECYCLING, LLC, | CASE NO. 13–07567–8-SWH |
| DEBRIS REMOVAL PARTNERS, LLC | CASE NO. 13–07570–8–SWH |
| SHOTWELL TRANSFER STATION II, INC., | CASE NO. 13–07572–8–SWH |
| KING'S GRADING, INC., | CASE NO. 13–07573–8–SWH |

　　　　　　　　　　　　　　　　　　　　　　　　　CHAPTER 11

　　　DEBTORS.

### SUPPLEMENTARY ORDER SETTING OUT BASES
### FOR DENIAL OF MOTION TO APPOINT CHAPTER 11 TRUSTEE

On June 13, 2014, the court entered a summary order denying the emergency motion of David A. Cook and LSCG Fund 18, LLC (collectively, "movants") to appoint a chapter 11 trustee in these consolidated cases. Movants having appealed that order, this supplementary order details the bases for the court's determination.

## BACKGROUND

Movants filed two emergency motions for appointment of a chapter 11 trustee pursuant to 11 U.S.C. § 1104(a); the first on October 31, 2013, and then a renewed and restated emergency motion ("Renewed Motion") filed on May 1, 2014. A hearing on the first emergency motion took place on November 25, 2013. Movants were able to introduce much of their evidence, but time constraints prevented them from completing their presentation. Shotwell Landfill Inc. ("Shotwell"), which at that time was the only debtor, did not have an opportunity to present any evidence. Thus, a second day of hearings was scheduled for January 30, 2014, and in addition, the court summarized for the record the key points of the consensus reached by the movants and Shotwell at a conference held prior to the November 25 hearing: Namely, that the confirmation hearing scheduled for December 17, 2013 would be continued, that counsel for Shotwell would file additional chapter 11 petitions for the debtor's affiliated entities, and that a motion for administrative consolidation of those cases would be filed. Further, the court noted that the parties had agreed to mediate the matter during the first weeks of January 2014, to adhere to a stand-still agreement in the interim, and to keep the court apprised of any developments that might impact the scheduled hearings. Transcript of Hearing (Nov. 25, 2013) at 166-77.

Over the next several months, the hearing was continued three times. Counsel for Shotwell filed the chapter 11 petitions for the debtor's affiliated entities, and the cases were administratively consolidated. Mediation was not successful, and the consolidated cases remained on track for confirmation hearings.

On May 1, 2014, movants filed a Renewed and Restated Emergency Motion for Appointment of Chapter 11 Trustee (hereinafter "Renewed Motion"), seeking the immediate

appointment of a trustee in all of the affiliated Shotwell cases. Movants asserted that the landfill was "now in danger of being shut down due to violations issued on April 16, 2014 by the North Carolina Department of Environment and Natural Resources ("NCDENR")." In addition, movants stated that they had "become aware of additional facts that show King's ongoing self-dealing and fraudulent management of the Debtors." Renewed Motion at 2. Movants represented that this motion and supporting memorandum provided "additional supporting facts that further detail King's gross mismanagement of the Debtors and his inability to act in a fiduciary capacity," and appended attachments consisting of "expert analysis and extensive documentation," which altogether spanned almost 900 pages.[1] Movants' Brief and Mem. Of Law In Support of Renewed Motion at 6 n.5.

On May 13, 2014, debtors filed a motion to appoint Doug Gurkins as the Court Restructuring Officer ("CRO Motion"). From the debtors' perspective, movants' efforts to have a trustee appointed are part of an "aggressive campaign designed to force the Debtor into liquidation," which movant LSCG (as purchaser of the debt owed by Shotwell to BB&T) would prefer over debtors' efforts to reorganize. Motion of Debtors in Possession for the Appointment of Doug Gurkins as CRO at ¶ 3. The debtors filed the motion to appoint Mr. Gurkins to "take charge of the Debtor's

---

[1] Throughout this case, movants have elected to make expansive arguments that are more appropriately considered in the context of confirmation than in connection with the motions to appoint a trustee. This unfortunate practice comes at enormous cost not only to them (although as instigators of it, movants presumably are willing to shoulder the financial burden), but also to the debtors, who must expend considerable time and funds in response, and to the court, which must read and consider these materials.

Many of movants' decisions in the affiliated bankruptcy cases are derived from and are reflective of their distrust of the debtors' principal. While this court is no stranger to contentious cases and bankruptcy courts in general are well-equipped to resolve them, it is difficult for the bankruptcy process to proceed effectively when a party adopts a single-focus approach of this nature, to the exclusion of more relevant issues.

3

finances and to monitor the Debtor's environmental compliance," their rationale being that appointment of a CRO would be responsive to movants' expressed concerns while also permitting debtors to operate the businesses and proceed to confirmation without the distraction and escalating costs involved in the trustee motions.

On May 20, 2014, debtors filed a response in opposition to the Renewed Motion, arguing that the NCDENR notice was not atypical of those received by competing landfills, such that no emergency existed, and also pointing out that debtors had not yet had an opportunity to present evidence in response to the trustee motions. Debtors maintained that their evidence would demonstrate the lack of any emergency, operational or financial, and that the great majority of their financial transactions were both appropriate and fully disclosed. Debtors argued that appointment of a CRO with full financial control was the appropriate way to assess and, if necessary, reorganize the debtors' finances, rather than appointment of a trustee under 11 U.S.C. § 1104(a)(1).

A hearing on the Renewed Motion was held on May 21, 2014. The court heard evidence from movants and the debtors and, at the conclusion of the hearing, invited the parties to provide short, bullet-point memoranda highlighting the key aspects of their positions together with the evidence in support of them. Movants submitted an outline, plus an additional Brief and Memorandum of Law In Support of Renewed Motion, in which they discussed what they characterized as alternative "remedies" then pending before the court; their motion to appoint a trustee, and the debtors' motion to appoint a CRO (the "CRO Motion"). In this brief, movants proposed a third alternative: They would change position and support the CRO Motion over their own, if the court were to conditionally approve the movants' disclosure statement, allow movants

4

to circulate their competing plan among creditors for voting, and set both debtors' plan and movants' plan for confirmation at the same time.[2]

Citing financial mismanagement that they believe to be both long-term and likely to continue in the absence of curative measures, the Bankruptcy Administrator ("BA") and the Unsecured Creditors Committee ("UCC") filed brief outlines supporting the appointment of a trustee. The BA and UCC agreed that a CRO could be beneficial to the estate in the short term, assuming that the case stayed on track to confirmation; however, they had concerns about the costs to the estate upon appointment of a CRO, and anticipated that a trustee would be better able to assess and administer the case than a CRO if confirmation ultimately was denied.

The debtors' outline recapped the evidence from both their own and movants' experts to the effect that there are no emergency conditions at the landfill as a result of operational failings by Mr. King. On the topic of financial mismanagement and impropriety, debtors highlighted the evidence tending to show that most of the transactions about which movants complained were typical of affiliated companies with common ownership, were supported by Mr. King's exercise of his business judgment, and were fully disclosed, even if some of the transactions ultimately were inappropriate in the context of bankruptcy. Debtors also summarized Mr. Gurkins' testimony with respect to the extent he would exercise control over all of the affiliated debtors' financial transactions; oversee and make inquiries as he deemed necessary in connection with financial,

---

[2] The movants' Amended Chapter 11 Plan was filed on July 16, 2014. (DE #665.) The Amended Disclosure Statement was filed and conditionally approved on July 18, 2014. (DE #677.) Confirmation on that Amended Chapter 11 Plan was scheduled for August 18, 2014.

environmental, and engineering matters; ensure that the debtors' practices going forward conformed to the bankruptcy processes and requirements that now apply to them; and recommend to the court that a trustee be appointed if, in his professional opinion, such an appointment was warranted.

After full review of the parties' filings and evidence, the court entered summary orders denying movants' Renewed Motion and granting the debtors' CRO Motion. The movants having appealed that denial, the court will set out the bases for the court's exercise of its discretion in determining, based on the evidence, that movants failed to establish grounds sufficient to require the appointment of a trustee under §§ 1104(a)(1) or (a)(2).

## DISCUSSION

The standards applicable to appointment of a chapter 11 trustee for cause are set forth in 11 U.S.C. § 1104(a), which provides:

> (a) At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee –
> (1) *for cause*, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; or
> (2) *if such appointment is in the interests of creditors*, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.

The appointment of a trustee in a chapter 11 case is "an extraordinary remedy, and there is a strong presumption in favor of allowing the debtor to remain in possession." In re Tanglewood Farms, Inc., 2011 WL 606820 *2 (Bankr. E.D.N.C. Feb. 10, 2011), quoted in In re Bergeron, 2013 WL 5874571 *6 (Bankr. E.D.N.C. Oct. 31, 2013). A party seeking to establish "cause" to appoint a trustee "has the burden of showing, by clear and convincing evidence, that cause as defined by § 1104(a)(1)

6

exists." In re Davis, 2010 WL 2640587 *2 (Bankr. E.D.N.C. 2010). The court has "discretionary authority to determine whether a debtor's conduct rises to a level sufficient to warrant the appointment of a trustee." Id. *2 (citing Dalkon Shield Claimants v. A.H. Robins Co., 828 F.2d 239, 242 (4th Cir. 1987)).

The court recently discussed the circumstances under which appointment of a trustee is appropriate at length in Bergeron. In that case, as in this one, the moving party alleged "that the debtor's propensity for fraud, dishonesty, [and] incompetency along with the instances of prepetition mismanagement and anticipated gross mismanagement of the assets of the bankruptcy estate warrant appointment of a chapter 11 trustee under 1104(a)(1)." Bergeron, 2013 WL 5874571 *6. While the material facts underlying that case were dissimilar (being based on the debtor's alleged failure to obey the terms of a TRO and other misconduct during a state court action), the applicable precedent, relevant considerations, and the process this court must follow are the same:

> Under § 1104(a)(1), the "determination of cause ... is within the discretion of the court and due consideration must be given to the various interests involved in the bankruptcy proceeding." Dalkon Shield Claimants v. A.H. Robins Co., 828 F.2d 239, 242 (4th Cir. 1987), quoting In re Gen. Oil Distrs., Inc., 42 B.R. 402, 409 (Bankr. E.D.N.Y. 1984)). The statute, however, should be flexibly applied because "the concepts of incompetence, dishonesty, gross mismanagement and even fraud all cover a wide spectrum of conduct." Id. In determining whether cause exists to support the appointment of a trustee, courts may consider a wide variety of factors including, *inter alia*, whether the alleged misconduct or mismanagement was material. (Citation omitted). In exercising this discretion, "due consideration must be given to the various interests involved in the bankruptcy proceeding." A.H. Robins, 828 F.2d at 241; see General Oil Distrs., 42 B.R. at 409 ("While under 1104(a)(1) the Court is not directly called upon to weigh the costs and benefits of appointing a trustee, it nevertheless cannot ignore the competing benefit and harm that such an appointment may place upon the estate." (citation and emphasis omitted)). Even "in circumstances where fraud or mismanagement is present, the legislative history of § 1104(a)(1) suggests that the court... 'balance the benefit to be gained from such an appointment against the detriment to the reorganization effort and the rights of the debtor that may result from such an appointment.'" In re Hamilton, No. 11-07491, 2012 WL 2204904, at *3 (Bankr. E.D.N.C. June 14, 2012)

>   (quoting 7 Collier on Bankruptcy 1104.02[3][b] (Alan N. Reskick & Henry J. Sommer eds., 16th ed.)).  If, however, the court determines that cause exists, appointment of a trustee is mandatory.  In re Davis, Nos. 09-10198, 10-02711, 2010 WL 2640587, at *2 (Bankr. E.D.N.C. June 29, 2010) ("[O]nce the court makes a finding that cause exists under § 1104(a)(1), 'there is no discretion; an independent trustee must be appointed.'" (citation omitted)); In re 1031 Tax Grp., LLC, 374 B.R. 78, 86 (Bankr. S.D.N.Y. 2007).

Id. *6.  The court looks more closely at post-petition acts in determining whether the movant has established cause, because while "the plain language of § 1104(a)(1) calls for an examination of both prepetion and postpetition conduct of the debtor or its management," the "'focus is on the debtor's current activities, not the misdeeds of past misconduct.'"  Id. at *7 (quoting 1031 Tax Grp., LLC, 374 B.R. at 86).

Turning now to the cases at hand, the court has determined that movants did not satisfy their burden of establishing, by clear and convincing evidence, the existence of cause sufficient to appoint a trustee under 11 U.S.C. § 1104(a)(1).  Despite movants' insistence that their motion was prompted by escalating emergency circumstances and recent, post-petition conduct, their evidence failed to establish the existence of any emergency, whether ongoing or anticipated.  In addition, the evidence presented in connection with the many financial misdoings or mistakes attributed by movants to Mr. King (and, through him, to the debtors) did not, considered cumulatively, establish the requisite level of "cause."

Similarly, the evidence submitted by movants did not persuade the court that appointment of a trustee was in the best interest of creditors pursuant to 11 U.S.C. § 1104(a)(2).  As discussed in more detail below, what the weight of the evidence did establish – quite convincingly – is that the

creditors' interests are best served by the combination of the CRO's exercise of control over the debtors' financial matters, together with Mr. King's continuing operation of the debtors in consultation with the CRO.

## I.     Lack of Cause under § 1104(a)(1)

As the court made clear at the outset of the May 21 hearing, it already was familiar with the foundation for the original emergency motion, and was of the view that those issues either had been addressed or were appropriate for resolution in the context of the confirmation process, which was then underway. Movants understood and agreed with this posture of the case, and as colloquy between the court and counsel made clear, movants sought in their Renewed Motion to address "emergency circumstances." Transcript of Hearing at 12-14.

> Specifically:
>
> The Court: So I need to know why – *what it is about these [circumstances] that now makes us not want to even go through a confirmation process that we're already in the middle of, giving you the same arguments, incompetent management, that you could have in a confirmation scenario so – so as to change tracks and to have a Chapter 11 trustee instead.*
>
> Counsel: And the answer is that going forward ... with a Chapter 11 plan requires Mr. King to continue to be in possession, continue to operate. He's had a year. Shotwell Landfill filed April 19th of last year and –
>
> The Court: *So it's to keep a plan from being confirmed, not because there are now emergency situations that require a Chapter 11 trustee?*
>
> Counsel: *No, ma'am.* We have been investigating this, as – as you know, for a long time.
>
> The Court: Uh-huh.
>
> Counsel: Our initial motion was filed in October of last year. And, no, it – it – *this is an emergency.* ...

9

> *We have a situation where we are finding out more and more as time goes on. And that is the basis for us renewing and restating the trustee motion. And that is the basis for us attaching all the evidence and all the reports. Two of those experts you're going to hear from now – next and they are pointing out that this continues post-petition, both operational problems and – and self-dealing and all the other stuff. It continues post-petition. And that is why this is an immediate need, Your Honor, and not something that waits for a confirmation.*

The Court: Okay.

Counsel: But in addition I would say that it affects confirmation in this way, because Mr. King is the same person who would be operating this for however many years his plan goes on and the creditors can't depend . . . on him to be open, much less that he will meet his obligations. He's shown himself to be untrustworthy. That's the short answer that I would give to you.

The Court: And – and that, of course, would also go to feasibility.

Counsel: Yes, it would. Yes, yes, Your Honor.

The Court: Just on a straight 1129 –

Counsel: – Correct.

The Court: – Fee [sic–feasibility] analysis.

Counsel: Correct.

The Court: Okay.

Transcript of Hearing (May 21, 2014 ) at 14; see also Transcript at 144-48 (court's subsequent efforts to clarify the nature of movants' concerns).

There is no required "emergency" component in § 1104(a): not in the process by which a movant establishes by clear and convincing evidence that cause exists to appoint a trustee, and not in the standards by which courts assess that evidence. Here, though, movants dramatized their motion to appoint a trustee by forecasting imminent harm in two respects: first, escalating problems with landfill operations based on a notice of violation issued just two weeks prior to the Renewed

10

Motion being filed, which they alleged showed debtor Shotwell's risk of both a "severe fire" and of being subject to fines or a shutdown from NCDENR; and, second, post-petition instances of financial misconduct and self-dealing by Mr. King. This posture initially was confusing, in that the advertised emergency circumstances never appeared, notwithstanding movants' insistence that they would.

Instead, based upon all the evidence presented, it appeared to the court that what movants primarily sought to establish was that the debtors' owner Mr. King could simply not be trusted to work with or for any of the debtors in any capacity, based upon his actions both pre- and post-petition. E.g., Transcript of Hearing at 57 (testimony of solid waste engineer Mr. Stacy Smith (noting that problems at the Shotwell landfill are "not uncommon" but that "you can see a pattern of them continuing to linger, and that it's "hard to say" whether issues at the Shotwell landfill are "much worse than or par for the course with" other landfills); at 277 (testimony of Mr. William Barbee ("Again, as I've said, really, the major issues are the pervasive nature of the allegations that are laid out within my report.")).

The court's consideration of the evidence and arguments was not affected by this dearth of emergency circumstances. It was, instead, based upon whether the evidence that was presented established, to a clear and convincing degree, the existence of cause under § 1104(a)(1).

### A.    Escalating Operational Risks at Landfill

Movants argued that Mr. King was incompetent to manage the landfill, and that he makes short-sighted decisions that increase risks and ultimately cost the debtors money, as evidenced by Shotwell's receipt of a Notice of Violation from the NCDENR on April 16, 2014. In support of this position, movants presented the expert testimony of Mr. Stacy Smith, a solid-waste engineer.

11

Mr. Smith testified that a Notice of Violation is the second step taken by the NCDENR for noncompliance (those steps being an expression of concern, a notice of violation, a compliance order that could be associated with a monetary penalty, or a shutdown). (Transcript of Hearing (May 21, 2014) at 65.) Shotwell has not been assessed a civil penalty, in this instance or otherwise. (Transcript at 65.) There are various ways to address the excess tonnage situation, all of which have competing costs and benefits. (Transcript at 58-61.) In this instance, Mr. Smith's greatest concern would be with respect to a fire based on the way wood debris was stored. Mr. Smith did not testify that he found the risk of fire at the Shotwell facility to be high, or imminent. Rather, he testified that it was "not uncommon for landfills to exhibit fires from time to time, and then what we do is we put measures in place to manage that." If a fire does occur, it would be a significant problem. (Transcript at 41.) Mr. Smith's testimony established that "the issues that you're dealing with here are common to many landfill operations and those – you know, there's just procedure and – and operations, practices that mitigate those. So, no, I don't think that they're uncommon. However, you can see a pattern of them continuing to linger." (Transcript at 57, 65.)

Movants also directed the court to the testimony of Mr. Vance Moore, Shotwell's engineer, who when testifying about Mr. King's efforts to bring Shotwell into compliance, ultimately agreed that it could sometimes cost more to fix a problem than it does to prevent it in the first place. (Transcript at 159-162.) Mr. Moore testified that he did not believe the landfill was in danger of being shut down, and believed that there was a danger of fire, but that it was not significant and was similar to that seen at numerous other landfills. (Transcript at 104-05.) Mr. Moore's testimony established further that he had recommended certain steps to Mr. King to reduce the woodpile, that Mr. King was following that advice, and that the volume had been significantly reduced in the

12

preceding month. Mr. Moore testified further that in his capacity as Shotwell's engineer, he had met with state officials to discuss possible methods of complying with the state's requirements and had a "very favorable" response from them. (Transcript at 153-54.) Finally, when asked if Mr. King followed his advice, Mr. Moore replied that he "can't say that I've had problems with the way Mr. King has followed my advice." In response to the follow-up question of whether Mr. Moore wished Mr. King would have done things differently, Mr. Moore said "yes, and I will say that for almost every operator I work for." (Transcript at 159-60.)

Both movants' expert and Shotwell's engineer provided considered, thoughtful, credible testimony. The vast weight of that testimony establishes that Shotwell received a Notice of Violation requiring action to bring the landfill into compliance with state regulations; that such a notice requires prompt attention, but is a non-remarkable thing in the landfill world; and that fires (as to which there was *no* evidence of an imminent risk) are a known hazard of landfill operation. The evidence also established certain seasonal aspects to landfill operation, chief among them being that the advent of spring, according to Mr. Moore, is when an operator should "jump on and correct these things." (Transcript at 162.) Mr. Moore explained that he believed Mr. King "jumped on it in those time frames [April-May] versus trying to do it during the winter when he would get diminishing returns and you may create a bigger problem than the one you were trying to solve in the first place." (Transcript at 162-63.) While movants argued that Mr. King was engaging in remedial measures only in response to the trustee motion and recent NCDENR violation, the court found the engineer's testimony more plausible.

Based on Mr. King's testimony regarding his objectives and decisions in dealing with the wood debris that accumulated at the Shotwell site after tornadoes in recent years (such as whether

13

to burn, bury, or grind it up, together with the cost, applicable regulations, and long- or short-term repercussions of each choice), as well as the testimony of both experts regarding Mr. King's operation of the site, his amenability to advice and attention to the restrictions applicable to the landfills, and the current status of the landfill, the court concluded that the day-to-day operations of the Shotwell landfill, at present and in the foreseeable future, are well within the bounds of normal operating procedures for this particular industry.  The evidence presented gave the court no basis upon which to conclude that a trustee could step in and operate the Shotwell landfill and the other affiliated debtors (movants seek appointment of a trustee in all cases) at a higher level of operational efficiency and compliance, or even at an equivalent level.  Instead, the evidence indicates that as to landfill operation, Mr. King's performance may be imperfect, but it appears to be in all respects competent, such that Mr. King's ongoing involvement with the coordinated operation of Shotwell and the related companies is very likely in the debtors' and creditors' best interests, at least for the foreseeable future.

        **B.**       **Financial Misconduct and Self-Dealing by Mr. King**

The real root of movants' objections to Mr. King's continued involvement with the debtors pertains to financial matters.  Movants allege, in their Renewed Motion, in the original motion, and in virtually every other document submitted in these cases, that Mr. King engages in fraud upon the creditors and the court, engages in self-dealing, mismanages the debtors' estates, and omits crucial disclosures – supplying them only when the omissions are pointed out by others.  In sum, they allege that he "manages the Debtors incompetently, and his actions reek of dishonesty." Movants' Brief

14

and Mem. in Supp. of Renewed Motion at 5. As the court noted earlier, this has been an acrimonious case as between the parties, and movants' use of hyperbole and unnecessarily voluminous filings has done nothing but exacerbate matters.

With respect to the *specifics*, movants argue that Mr. King "pays pre-petition obligations post-petition, which is not allowed by the Bankruptcy Code, and King acknowledges same." Id. at 12. Specifically, movants contend that Mr. King caused King's Grading to pay Turner Asphalt to complete a paving project on one Thornton Road, where the King's Grading debt was secured by a bond upon which Mr. King and his wife are obligors, "so that David and Shelly King would not be liable under a performance bond that they personally guaranteed." Movants' Outline in Support of Appointment of Chapter 7 Trustee at 1. Mr. King acknowledged the paving expenditures and also testified, credibly, as to his business rationale in making them (generally, that he was obligated to do the work, that failure to do so would have resulted in the State calling the bond, and in the inability of Shotwell and other entities to obtain future bonds). The evidence showed that prior disclosure and approval requirements for the paving project were not met, but also supported debtors' argument that the expenditures otherwise were consistent with good business practices, such that movants' characterization of the road improvement payments as the most recent example of Mr. King using the debtors' money to pay his own personal obligations was not persuasive.

Movants also cite other post-petition transactions reflecting what they contend are questionable and excessive payments to Mr. King and his spouse, as well as multiple post-petition questionable transfers between the affiliated entities. See, e.g. id. at 1-3. In support of this, movants' witness Mr. William Barbee, an accountant, testified regarding his conclusions as to financial irregularities in general and questionable transfers to Mr. King and other insiders

15

(including the affiliated companies). However, the court found Mr. Barbee's testimony and the conclusions he drew to be inconclusive and somewhat speculative.[3]

Much of what Mr. Barbee found to be irregular stems from the fact that pre-petition, the debtors used inter-company accounts to track transfers of income or debt, accounts receivable, and the like. (In this, significantly, the debtors' conduct was not dissimilar from other closely-held companies – it's not a sound business practice, but is a common one.) *Post*-petition, the debtors' evidence showed, the transactions between some companies changed to reflect actual, not inter-company transfers, in that the companies began to actually pay each other. This accounting change, in and of itself, appears to be the catalyst for many of the concerns now expressed by movants – that Mr. King is responsible for moving and hiding funds to which he is not entitled.

In sum, the testimony and supporting documentation established that the debtors' pre-petition financial record keeping methodology was sloppy; post-petition, the repercussions from those earlier practices linger. It is readily apparent that Mr. King has not observed the formalities involved in ensuring that separate companies' debts and assets are properly segregated, and that he is not qualified to do so going forward. By his own account, Mr. King fails to recognize the significance of income and/or expenditures being attributable to one company instead of another, and has only a generalized understanding of how funds move within the affiliated companies, or who owes what to whom. Transcript of Hearing (May 21, 2014) at 259-271.

What remains undetermined is what these practices reflect: intentional fraud (according to movants), incompetence to act as a fiduciary (according to the BA and UCC), or, a lack of skill and

---

[3] In addition, the court notes that Mr. Barbee's testimony was based in large part on hearsay from David Cox, a former employee with a disputed claim in the case.

16

attention to detail that previously was not a problem for the debtors, but is now (according to debtors). There are competing explanations for virtually all of the challenged transactions, and movants have not offered credible evidence to support their allegations of fraud, deceit, and self-dealing. "Mere allegations, which are contested, that a debtor or its management have engaged in fraud, dishonesty or other similar conduct are not sufficient to warrant appointment of a trustee." Bergeron, 2013 WL 5874571 *7 (Bankr. E.D.N.C. 2013) (citing In re Piedmont Center Invs., LLC, 2011 WL 5903398 (Bankr. E.D.N.C. 2011)).

The court concluded, based on the testimonial evidence presented over two days of hearings and in the thousands of pages of supporting material, that management of the debtors' finances will require professional, outside intervention to determine the current status of each of the debtors and to establish crucial protocols going forward.[4] That does not, however, warrant the appointment of a Chapter 11 trustee over the debtors' objections. As discussed above, not only did movants fail to establish that Mr. King is incompetent to remain involved in the debtors' operations, the court was instead left with the solid impression that Mr. King's present involvement in landfill operations is appropriate at this time.

## II.    Appointment of Trustee Not in Best Interests of Creditors under § 1104(a)(2)

Similarly, and based on all the foregoing, the court concluded that appointment of a trustee was not in the best interests of creditors. The persuasive and uncontradicted testimony of Mr. Gurkins established his ability to exercise complete and unfettered control over the debtors'

---

[4] That process was facilitated by Mr. King's willingness to put all of the affiliated debtors into bankruptcy, such that the court could have the full picture of the related entities' financial standing. It also is worth pointing out that Shotwell was both solvent and current on its loans as of the petition date, and filed the chapter 11 petition because creditor BB&T would not renew its loans.

finances, including the exclusive authority to make expenditures, while still relying on Mr. King's decade of experience in operating the landfill businesses.   Accordingly, the motion is **DENIED.**

    **SO ORDERED.**

**END OF DOCUMENT**